Good morning, ladies and gentlemen. Our first case for this morning will be Neal Verfuerth v. Orion Energy Systems. You are Mr. Walczewski? I am. Good morning. Good morning, your honors. As Chief Judge Wood noted, my name is James Walczewski and I represent the plaintiff appellant Neal Verfuerth v. Orion Energy Systems. Today, Orion Energy Systems removed Mr. Verfuerth as CEO in response to his complaints of what he believed to be unlawful conduct under Sarbanes-Oxley. Today, this court is asked to answer three questions. The first two are, did Mr. Verfuerth engage in protected activity under Sarbanes-Oxley and was that protected activity a factor in the adverse actions Orion took against him? Facts and evidence in the record demonstrate that the answer to both of these questions is a resounding yes. That leaves a final question of whether Mr. Verfuerth's internal protected activity under Sarbanes-Oxley is also protected under Dodd-Frank. The SEC will be addressing that question directly. Can I ask though, one of the things that your opponents emphasize is all of these 10 Qs and 10 Ks in which he certifies that everything has been disclosed. This is at a time that he's the CEO and you would think, logically, that if he thinks something's missing that ought to be there, he simply orders somebody to revise it and puts it there. So I don't see what was preventing him from disclosing anything that he thought required disclosure under the securities laws and how we can reconcile his certifications that these forms were complete. Sure, as CEO he was required to sign and certify the annual and quarterly filings. However, what is different and I think what got lost in all this was that at the time Mr. Verfuerth made his complaints on August 29th and August 30th, 2012, August 30th is when he made his complaints to the full board regarding essentially the full gamut of issues that he had found and disclosed them to the board. He also refused to sign or certify any further SEC filings in light of their nondisclosure. Can we turn the clock back to when he's certifying these forms? He's got a few things, doesn't he, that he says should have been disclosed, whether it was the litigation with Prange or whether it was his feeling that this patent problem over the software was something that could affect the stock price of the company. Seems like there were a couple of other things too. And I just don't understand how he, how there's a problem that was not fully within his control and how he can at the same time honestly certify these things and at the same time not require that they be complete. Well the record shows, Your Honor, that the first time any sort of issue really comes to his attention that later he complains about is that towards the end of May of 2012. There's nothing in the record prior to that date that we're discussing at all in this case. And you can kind of see what I'll kind of refer to as a snowball effect over time. So the first issue that comes up is a potential patent issue relating to their control system. That's again at the end of May 2012. And you can see that it's sort of building steam through towards the end of June into July and again it kind of reaches a crescendo when he makes his full complaints on August 29th and August 30th. At that point he's not signing or certifying anything. And he's explicitly stating, I will not sign or certify anything else because of these violations. So the fact that he signed certifications over his, you know, he believed at the time that he made his complaints and that's what we need to be concerned about. But doesn't he sign, you're saying May 2012 is when the patent lawyer tells him about the intolight system. And he signs a June 14, 2012, 10-Q and a June 14, 10-K and an August 9th, 2012, 10-Q. Those are all after this disclosure, are they not? That's correct. And the record reflects, Your position to really declare these things to be violations of law. And that is a fact that was ignored by the district court. And that was Mr. Verifor's explanation essentially for what, you know, what was going on. I mean this is a very tight time period that we're talking about. And we have, you know, one piece of evidence that comes into play towards the end of May and nothing else is really going on at that time point as demonstrated in the record. But again as you just tick off like bullet points what you think should have been disclosed, what Mr. Veriford thinks should have been disclosed and it was not, other than the the Prange business and the intolight? Other than those, Your Honor? Yeah. Well there are violations of Orion's Code of Conduct. For example, there were conflicts of interest regarding board member Mark Williamson. As you go through that, it would help me if you could put a date next to those bullet points that the chief has asked you about. I'm trying to remember the exact dates that these things came into play. I know that the intolight system. If you can. Yeah, I'm trying. The intolight system came into play at the end of May. There was an event in July. Excuse me. The reason I ask that is you seem to say there became a tipping point. And I would probably put that towards the end of July and early August. That's when you can see in the record more things are happening. Again, there's the the conflict of interest with respect to Marks Williamson. There's the CPA issue regarding board members Michael Altshafel. There's the, I believe it was July 25th. Under what rule does somebody who chairs an audit committee have to be a CPA? I'm not familiar with any such thing. Well the question isn't whether or not Mr. Variforth subjectively believed that to be the case. And the record shows that Paul Kardish, the general counsel, told Mr. Variforth that in his understanding that individual needed to be a CPA. And Mr. Kardish is not only the general counsel but as an attorney he's well versed in securities laws and Sarbanes-Oxley. Apparently not too well versed though because there is no such requirement. But that's the individual who's advising Mr. Variforth. And we need to look at what is the knowledge of the general counsel. And maybe he's not as great as maybe he should be. I don't know. But if his general counsel is telling him, you know, this is what it needs to be. He needs to be a CPA. Then that's going to be Mr. Variforth's belief. And he has no reason to believe otherwise. And what we're talking about... Don't we need these, don't, for Sarbanes-Oxley, don't we need to connect these various problems to some kind of market effect? I mean there's no duty under the securities laws of any type, Sarbanes-Oxley or elsewhere, to disclose every little blip that happens in a company. Some things happen that aren't so great. Other things happen that are very positive. But there's a materiality threshold. And he's converting all of these things into, I suppose, allegedly material omissions. Well, I have a couple points to that, Your Honor. First, again, because Mr. Variforth doesn't come into the CEO position with any sort of sophistication or level of knowledge with anything like that. He was relying on those around him to provide him with the information about what should and should not be disclosed, what is and is not material. And that's primarily Paul Karch. Again, that's the general counsel at the time. And the person, to cut to the chase to your theory, because this is another thing that's contested, he thinks that the board, he sees himself in the role as a whistleblower to the board. And telling the board that various things didn't happen that should have happened. And, you know, your opponents say that's not what whistleblowers are. In fact, the district court was dubious that that was the right characterization. Because he's basically just telling the board that certain things didn't happen. And the board knew that. The board was not in a position to necessarily know the things Mr. Variforth was bringing to its attention. However, I do want to highlight that the plain language of Sarbanes-Oxley does not create any sort of categories of whistleblower. It doesn't create any sort of categories of supervisor. The plain language of the statute explicitly states that an employee who raises information that he reasonably violates relevant law to his supervisor is protected. And that was recognized by the Southern District of New York in Leschinsky v. Talbot, which is in the materials, where there it was raised that the supervisor that the individual complained to was implicated by the individual's complaints. But, you know, some of the people he complains to are on the board. Correct. Basically what he's saying to them is you are doing this thing and you shouldn't be doing it. That's not whistleblowing. That's calling somebody out on what the propriety of what they're doing. Whistleblowing suggests you didn't know you were doing it before, but the board people knew exactly what they were doing. Your Honor, I think in this situation what maybe makes it a little bit different is that we have a situation where a board of directors received what it understood to be complaints of conduct that implicated Sarbanes-Oxley, and it took an adverse action response. Now, each and every thing that he complains about, maybe it's not going to rise up to a level, and that's really a question for objective reasonableness. You know, but there are matters that the record shows that Mr. Verfurth did raise to Orion's board of directors that were objectively reasonable. And in that instance, it's protected conduct, particularly, again, where the board understands him to be raising these matters and then takes an adverse action immediately in response. With respect to objective reasonableness, facts and evidence in the record shows that Orion admitted at summary judgment that two categories of complaints that Mr. Verfurth complained of to the board, specifically stock manipulation and failure to disclosure rules, violation of SEC disclosure rules, implicated Sarbanes-Oxley. There's also the fact that when Mr. Verfurth raised his complaints, Orion hired an outside law firm to investigate his complaints. The report of that investigation was – Maybe it was a prange business? No, they investigated his complaints that he raised. And we're not talking about the pranging matter whatsoever at that point. There's also, again, Paul Kardish believed that he too was engaging in protected activities simply by virtue of assisting Mr. Verfurth with raising these complaints to the board. And there's also the expert report of Richard W. Painter, an expert in a number of fields, who opined that if Orion took an adverse action in response to Mr. Verfurth's complaints, that would be retaliation or Sarbanes-Oxley. I see I'm reading to my time, so I'm going to save the rest for rebuttal. Thank you. Mr. Yoder. May it please the Court, Stephen Yoder for the Securities and Exchange Commission, as amicus in support of Mr. Verfurth. So, Mr. Yoder, I have to ask you, you know, events have kind of taken you by because the Supreme Court in digital realty is going to address the Dodd-Frank issue, right? There's no distinction between the Dodd-Frank issue here and there? That's correct. The legal issue as to the interpretation of Dodd-Frank is the same in this case as well as in the Supreme Court case. That's correct. And the briefing in the Supreme Court case is currently ongoing. The Commission wanted to participate in this oral argument to give the Court the benefit of its views because this is an issue that had been addressed by the District Court earlier in the litigation, and it's unclear from the District Court's summary judgment opinion to what degree the Court was relying on that earlier analysis. Could I ask you this? If we were to agree with the District Court's assessment of the Sarbanes-Oxley point, would there be any reason at all to reach the Dodd-Frank issue? There might potentially be, Your Honors. If you look at Section 21FH of the Exchange Act, that's the retaliation provision, that provision contains three clauses which are analyzed in our brief, and obviously Clause 3 cross-references Sarbanes-Oxley. And so to the degree that a report does not find protection under Sarbanes-Oxley, it would not be protected under that clause. However, the prefatory language of Subsection H specifically protects any lawful act in making a report that's protected under Sarbanes-Oxley. So potentially Subsection H does reach more broadly than Sarbanes-Oxley, strictly speaking. The Commission takes no position as to whether or not that any lawful act language should apply or be met on the facts of this case. But in response to Your Honor's question, that's the most fulsome answer that I can give you. It sounds pretty remote, actually, just cutting through everything you just said. Understood, Your Honor. That's unlikely. Understood. And if I may be— So what you've just represented to the Chief Judge, is that the position the Commission is taking in the Supreme Court? The Commission has not yet taken a position in the Supreme Court. We did take a position in the Ninth Circuit litigation below. We filed a brief and participated in that argument. At the Supreme Court, we obviously are required to defer to the Office of the Solicitor General. I understand. And currently the briefing is ongoing. If an amicus brief were to be filed in support of the whistleblower at the Supreme Court, that currently would be due October 17. And that decision will ultimately be made— So we'll have a clearer position of the Commission on October 17? Certainly, of the federal government. I think the Commission's position as an agency is adequately reflected in the amicus brief that we filed with this court, Your Honor. But, yes, it's to be expected that the executive branch's position would be reflected in a brief filed by the Office of the Solicitor General. So what you're basically saying is for the time being, for the next couple of weeks, this brief that you filed with us on May 9th represents— I take it this is consistent with what you also said in the Ninth Circuit on the scope of— Yes, it is, Your Honor. If you compare the two, the two briefs are substantially similar. We updated some of the case law and researched this court's precedents to replace the Ninth Circuit precedents we had cited in that court, Your Honor. So the brief is substantially similar. And our position in both courts is the same. Our position is that the Commission reasonably interpreted the whistleblower definition in 21F-A-6 as most naturally applying to the awards provisions in subsection B rather than the retaliation provisions in subsection H of the statute. But you're not really taking any position on the application of Sarbanes-Oxley directly. That's correct, Your Honor. We're not addressing that issue in our brief. We're only addressing— I'm just going to say on your—the Supreme Court will do what the Supreme Court does on Dodd-Frank, but there are some members of the Supreme Court who are very much at least public advocates of the plain language approach towards statutory interpretation. And it seems that the Commission may have an uphill battle with them. I don't know. Thank you, Your Honor. I'd be happy to address that if you want to, but I see my time is up. You have a minute. It's a wise choice, Counsel. Thank you, Your Honor. I appreciate it. Thank you very much. All right. Mr. Modell? Modell, yes. If you please, Court. Mr. Verfurth filed a 14-count complaint, amended complaint. All of the claims were dismissed. We just have two claims before this Court. The retaliation claims under Sox and the retaliation claim under Dodd-Frank. The conduct that's alleged is identical. There's not a distinction in conduct on one or the other for purposes of the claims that he's alleged. I do want to just address a couple of things up front that opposing counsel said, that all of these issues, for example, first came up in May of 2012. I think the record doesn't support that. For example, one of the concerns that Mr. Verfurth said he had was that there was overbilling through the law firm, and that went on for six years. That was obviously something that could have been disclosed any time in that six-year period. That was not an issue that came up in May of 2012. Mr. Verfurth has raised concerns with an employment agreement of Mr. Scribante. That employment agreement existed well before May of 2012. So I'm not sure that's an accurate statement that these are all issues that, when we look at what protected conduct is, that are between May 12th and September. One of the things that worries me about your position is when the Board finally gets around to sending him the termination letter on November 9th, it opens by saying, well, the real focus is on the attorney's fees payment, which I gather is some $60,000, and then grossed up to be about $90,000. But reading the record favorably to Mr. Verfurth, it looks as though he offers on a number of occasions to pay back whatever you wanted, $90,000 or some amount of money. So how can we reconcile those two things? Sure, this is obviously the cause issue. Which in the end is probably his biggest beef, right? He loses the buyout, he loses his role as Emeritus Chair. Sure, I think, though, if we put that in the context of what are the facts that were really undisputed. We know that he received $170,000, grossed up to $300,000. We know that there's no dispute. We know that he did not pay his lawyer $62,000 and change $62,500. Right, because there was a dispute. But at some point he says to you, okay, there's a dispute, I'll just pay it back. Can we take this issue off the table? Sure, but he doesn't do that, Judge. He gets a letter from the Chairman of the Board, Mr. Cackley, on October 22nd saying you're directed to pay that money back. He doesn't do that. He gets the same agenda for that September 8th, November 8th meeting on November 6th that everybody else on the Board got that said we're looking at a termination for cause for his failure to pay that back. One would think that if he truly was going to pay that money back and had an interest in doing it, between the 6th and the 8th when the meeting occurred, he would have done that. Does he have to do it? I mean, it seems that there's a negotiation going on. There is a negotiation going on as to how much he's got to sever himself from the company and other terms. If he has committed in a letter to pay it back as part of his side of the deal, why isn't that good enough? Well, he hasn't committed to do that because what we know is you're correct, there was negotiations going on, but those negotiations were unsuccessful. On October 19th, Mr. Verfurst said I want to resign, which he can do, and here are the terms. The terms required him to sign a release. That release, the Board members, the attorneys, he refused to do that. To get the $1.4 million severance package. Correct. Because the quid pro quo is the release. The context of where things are at in November is here's a person that is refusing to sign an agreement, the release that's required by his separation agreement, his employment agreement, and is he going to pay the money back because there's no agreement? Are we going to be able to take it from his, he says his PTO, his paid time off. He doesn't have $90,000 in paid time off. Why couldn't you just give him a severance package of 1.3 or whatever adjustment you need to to recoup whatever you think it is, let's round it up and call it $100,000. Well, he would have been paid the severance, but for the fact that he refused to sign what's required in his employment agreement, the release of claims, releasing the directors and releasing the attorneys. It would have been done had that occurred. But he refused to release those claims. And that was a condition precedent to getting his pay. So why didn't, there's a separation between refusing to pay him the severance and actually going so far as to terminate him for cause. I mean, you're accusing him of refusing to pay. Acts of dishonesty, misappropriation, and conversion. Those are pretty harsh accusations, it seems to me. And in fact, it doesn't really reflect that there's a dispute. For all I know, it's a legitimate dispute, or I don't have any idea. But there's a dispute with the attorney associated with the divorce, and you're just assuming this is not resolvable. I mean, he hasn't been dishonest about it. He's very open. He said there's a dispute and I'm willing to pay this back if you're insisting on that. Right, and I'm not going to dispute that in fact there was a dispute with his lawyer. The result was that the court ordered all the fees to be paid to the lawyer. When did that happen? The hearing was in January of 2013. So it hadn't happened yet on the date that your letter was sent? Correct. Okay. That's correct. All right. But again, the context of a judge is what we have is a person who is not agreeing to sign the release that's required by the agreement. So to say that, yeah, this person we should now trust that he's going to pay back the $90,000, the company doesn't have a reason to do that, and the chairman of the board has specifically said pay the money back, and when you resolve your dispute, then the money will be paid to you to pay your lawyer. Very simple. Where does he say that? Which letter? The October 22nd letter. October 22nd letter. Okay. So what do we do with this argument that Mr. Walczewski is presenting, that even if Mr. Fairfort was mistaken about the materiality of these omissions in the various SEC filings, he thought that they were close enough to being material omissions that he's under the protection of the whistleblowers? Yeah, I think the district court under these circumstances got it exactly right, and the reason is because what Sarbanes-Oxley requires is basically fraud conduct, right? It lays out there's mail fraud, there's wire fraud, there's bank fraud, and it's clear there's none of that that occurred. It talks about material misrepresentations. There's no allegation of that. There's no disclosure that was made that had anything that was incorrect about it, material or otherwise. So what about the patent, the pending patent litigation? Oftentimes firms do disclose. If some important patented product or process might lose its protection, the market likes to know that. That's the intolight business. Yeah, the intolight business, there was no pending patent litigation. Hadn't there been a discovery that there was an infringing or potentially infringing system? Well, Mr. Bareforth had said that he believes that there's been a representation that Orion had total proprietary interest in the intolight product, and there's some suggestion that that may not be the case. There was at least a partial investigation by his in-house counsel, Dr. Shana Conner, who is a patent expert, and the record shows that what she concluded preliminarily as she was doing her investigation is that there was not a problem. And there was, to our knowledge, never a problem. There was never a patent infringement case. There was never a finding of infringement. There was never a loss of Orion's rights in the intolight patents. So did Orion continue to use the system as it had been used, or did it discontinue? I can't really remember what the system did. Yeah, what ultimately happened with the judge is it was essentially the ability to save dollars, and it turned out that that system, the savings from the system versus what the cost of the system was, was so minimal that they ended up having significant inventory that was written off. But it had zero to do with the intolight patents. It had to do with just the technology. Okay. And there's some strange link between what Orion was doing and Solyndra, right? Yeah, there was. The SEC subpoena in August of 2012, because obviously there were concerns about the Solyndra bankruptcy. There was request for information from Orion because it sold Solyndra product. But I don't understand that to be something that needed to be disclosed. The SEC, there was a dispute about who should be representing Orion, whether it should be Foley and Lardner or somebody else. And ultimately the decision was made that it was going to be somebody else, K&L Gates. So it wasn't Foley and Lardner. It wasn't an issue about was something that should have been disclosed in a 10-Q, that wasn't disclosed. That wasn't an issue with that. I do want to say that the judge in this case, Judge Griesbach, I mean he essentially said under these facts it's difficult to see how a CEO would get protection. And I think that's exactly right under these facts. And the reasons are kind of two. One is it's a disclosure case. That's primarily what the allegation is. Should have disclosed additional information that wasn't disclosed. This is the CEO of the company. This is the person that has the obligation to disclose, has the obligation to certify on every single one of the 10-Qs and the 10-Ks that there have been no material misrepresentations or that there have been any material omissions that would make the disclosure misleading. Well, that's why I asked the first question I did to Mr. Walczewski, because it seems that at least some of the 10-Ks and 10-Qs, one 10-K and some of the 10-Qs, were filed at a time that he was alerted to these problems. And I don't know what would have prevented him from disclosing, actually. Correct. And I don't know that he was prohibited from disclosing in September. Or filing an amended form. You can do that, too. Correct. You can amend a 10-K. You can amend a 10-Q. You can, if something comes up, you can do an 8-K, which happened obviously with the SEC subpoena. They did an 8-K to alert shareholders and the public of that. They did an 8-K when Mr. Variforth was no longer going to be the CEO. So, yeah, there is nothing that prevents that sort of communication if there's truly a concern that something needed to be disclosed that wasn't disclosed. The other issue I think that Judge Griesbach hit on was most of these, what Mr. Variforth would call protected conduct, is basic run-of-the-mill management issues. It's not fraud issues. And as the CEO, you deal with those issues. So Foley and Lardner billing, if you truly think that there is a concern with Foley and Lardner billing, you do what clients across the entire country do. You say, okay, here are the new rules of the game. You need to do no block billing. You need to get approval for anything that's going to be more than three hours. All the things that we as lawyers see clients do on a routine basis. That's a management issue. Mr. Variforth has seen these bills for five, six years that he's now complaining about. That's not a fraud issue under Sarbanes-Oxley. Now, for Sarbanes-Oxley purposes, we have this long e-mail that he sent that he refers to as his whistleblowing using the internal processes. Is it your position that's not good enough for Sarbanes-Oxley in terms of format or it's the content that you're objecting to? Well, I think first from a content point of view, most of those things are not the fraudulent conduct and they're basically the run of the mill issues. I think also under the subjective test that this court has noted in HARP that when you're 43 minutes before the meeting, we're going to have a discussion about terminating you and you now send out an e-mail saying, okay, I've got all these concerns. I think there's a significant reason to question the good faith of that document. Well, you would agree if something really was related to a fraud, it wouldn't matter that it was 43 minutes before the meeting, would it? It probably would not, but again, if the things that are supposedly fraudulent, for example, the Foley billing, and 43 minutes before the meeting you raise this for the first time and say, in fact, that qualified under Sarbanes-Oxley, I still think one could say, yeah, I think that there's some question as to whether you subjectively believe that that was fraudulent conduct. Okay. Unless the court has any other questions? I see none, so thank you very much. And I believe you reserved some time, Mr. Walczewski. Thank you, Your Honor. To answer the court's question earlier about timing, the only issue that came up in May was the intellect concern. The rest, as you'll see, happened towards the middle to end of July and into August. I want to be clear on something, that in order to have engaged in protected activity under Sarbanes-Oxley, there's no requirement that Mr. Verfurth prove that fraud was actually committed. There's no requirement that our federal law was actually violated. What is required is this circuit recognized in Hartfordshire Charter Communications, Inc., is that Mr. Verfurth subjectively believe that what he complained about violated relevant law and that the subjective belief be objectively reasonable. In here, facts and evidence in record demonstrate Mr. Verfurth's subjective belief and the objective reasonableness of the saying. Is that subjective belief that you advance, it all clouded by these financial transactions outside his normal salary, I assume? Financial transactions? Well, I mean, loaning money for a divorce. Oh, when we're talking about that? Yeah. What I think should be the focus, Your Honor, is what is his subjective belief when he's raising his complaints in the first instance? In particular, we're looking at August 29th and August 30th when he lays out, again, the full disclosure of all the complaints that he has, refuses to sign or certify anything else, and further, he states his intention to meet with the SEC about these same issues. At that point, there's nothing in the record demonstrating anything other than a good faith belief that what he was complaining about violated the law. And then he does actually certify for Wells Fargo that nothing's been wrong because they're alerted at this, the company is alerted at this point. And it's not just a going forward. It's a everything was disclosed. Sure. The record shows that the first such certification Mr. Variforth signed was on March 21st, 2013, approximately seven months after he complained to Orion's board. And then the record, also during this time period, Mr. Variforth believed that he had done everything that he could because not only had he He certified 19 filings, didn't he? I'm sorry? He certified 19 filings? I believe over the course of his entire career as CEO, yes. But with respect to the certifications he signed after the fact, the record shows that not only had he orally complained about all the matters that were discussed and that's in the briefings, but he had also filed a formal complaint internally with Orion, pursuant to Orion's policies and pursuant to Sarbanes-Oxley. He had also provided a copy of that complaint to the Department of Labor. By that time, he had filed his OSHA complaint, alleging that he was retaliated against under Sarbanes-Oxley. By that time as well, Orion had already responded to that complaint and was active in litigation with Mr. Variforth at OSHA. So it has been disclosed. By the time he signs the second one in June of 2013, he had already been in communication with the SEC, specifically Scott Tandy, the attorney. They have no record of that, do they? I'm sorry, what was your question? I thought that the SEC had no record of complaints being filed by Mr. Variforth. What came up was that there was a FOIA request and they could not find a record of a complaint filed by Mr. Variforth earlier. But there were communications later, actually, and I'm not sure that this is in the record. So on the record, would we have his written complaint? The written complaint to OSHA or the written complaint to the SEC? The SEC. The SEC complaint Mr. Variforth believes that he filed was filed electronically. So there is no written form of that complaint that's available. You wouldn't think he would, a document like that, he would keep in record? I don't know. I don't know what his habits are with respect to electronic communications. That's a whole basis of this, isn't it? No, Your Honor, it's not based on whether he filed something with the SEC. No, that has nothing to do with whether or not he engaged in protective activity or started violence, obviously. You do not have to file a complaint with the SEC in order to be protected. The SEC issues about Dodd-Frank, and I understand that Sarbanes-Oxley, the internal complaint, and there's some issues about it being broader or narrower. But just on the SEC point, there's a very weak record on that. Yeah, there's a dispute of fact regarding that. All right, thank you, Your Honor. I see I'm out of time. All right, thank you very much. Thanks to all counsel. We'll take the case under advisement.